IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHELLEY ANN CORBETT,

           Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner, Social Security
Administration,

          Defendant.

CIVIL ACTION FILE NO.

1:13-CV-03140-JFK

## **FINAL OPINION AND ORDER**

      Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied her disability applications.   For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **AFFIRMED**.

## I.    **Procedural History**

      Plaintiff Shelley Ann Corbett filed applications for a period of disability, disability insurance benefits, and supplemental security income in 2010, alleging that she became disabled on March 1, 2008.  [Record ("R.") at 20, 80-81].  After her

applications were denied initially and on reconsideration, an administrative hearing was held on February 23, 2012.  [R. at 37-77, 98-105, 110-15].  The Administrative Law Judge ("ALJ") issued a decision on May 2, 2012, denying Plaintiff's applications. [R. at 20-32].  The Appeals Council denied Plaintiff's request for review, and Plaintiff filed a complaint in this court on September 26, 2013, seeking judicial review of the final decision.  [R. at 1-5; Doc. 3].

## II.   Statement of Facts

The ALJ found that Plaintiff Corbett has low back pain, obesity, palpitations/supraventricular tachycardia, bipolar, major depressive disorder, and generalized anxiety disorder.  [R. at 23].  Although these impairments are "severe" within the meaning of the Social Security regulations, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. at 24]. The ALJ found that Plaintiff has the residual functional capacity to perform light work with a number of physical and mental limitations.  [R. at 26].  Although Plaintiff was found to be incapable of performing her past relevant work, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff

can perform.  [R. at 30-31].  As a result, the ALJ found that Plaintiff is not disabled. [R. at 32].

The ALJ's decision [R. at 20-32] states the relevant facts of this case as modified herein as follows:

Emergency records from Newton Medical Center show that the claimant had a June 2006 visit for right hip sprain and a January 2007 visit for acute pharyngitis with hypertension to be ruled out.  (Exhibits 3F and 8F).

Medical records from Rockdale Medical Center document a total abdominal hysterectomy, performed in April 2008, with no malignancy identified on pathology. She developed a subcutaneous hematoma postoperatively.  This was shown to be resolving on ultrasound of the abdomen obtained in early May 2008.  (Exhibit 7F).

Records of treatment from Alliance Family Care, LLC, covering the period from January 2006 to October 2011 show a variety of diagnoses including: cough and acute bronchitis; palpitations; upper respiratory infections; anxiety state; bursitis; benign hypertension; TMJ arthralgia; allergic rhinitis; obesity; menopausal disorder; bipolar I disorder, single episode, moderate; lumbago; and infective otitis externa.  The claimant's height is recorded as 67 inches, and her weight during this period fluctuated within the range from 186 to 233 pounds.  Examination on January 25, 2010, revealed

3

decreased range of movement in the lumbosacral spine with tenderness to palpation and paraspinous muscle tenderness, but negative straight leg raising. (Exhibits 2F, 6F, and 9F).

Medical records from Largo Medical Center are for a brief hospitalization, from August 19 to August 22, 2009. Although the claimant, on admission, complained of hemiplegia and hemiparesis, the principal diagnosis was shown as anxiety state. During that admission, she also underwent laparoscopic cholecystectomy for biliary dyskinesia and gastroenteritis. She reportedly tolerated the procedure well. (Exhibit 1F). During an office visit on August 28, 2009, the claimant claimed to have had a stroke as well as a cholecystectomy. (Exhibit 6F). However, the hospital records clearly do not document a stroke or any such neurologic event. (Exhibit 1F).

Records from the Gwinnett County Detention Center are from November and December 2011. This evidence consists primarily of administrative forms or questionnaires that were completed based on information provided by the claimant. The claimant's height is recorded as five feet six inches and her weight 214 pounds. On November 9, 2011, she reported that she had previously been diagnosed with clinical depression and bipolar, for which she had been on Cymbalta and Seroquel. But she stated that she had been off both medications and was suffering badly with

4

headaches, nightmares, trembling, and severe depression. On November 17, 2011, she requested that she be moved to a medical unit so that her heart condition, supraventricular tachycardia ("SVT"), could be closely monitored. Notes indicate that she was to be "scheduled to see provider." On that date the claimant also reported that she had been on Cymbalta, Xanax, and Seroquel until she was incarcerated. She indicated that she had been seen twice by a mental health counselor but still had no medication. She was described as tearful, labile, and agitated. The claimant was seen by a medical provider on December 12, 2011, for evaluation of SVT. A baseline EKG was obtained on December 13, 2011, and notes from December 15, 2011, show that Atenolol was prescribed. (Exhibit 10F).

The claimant testified that she currently lives in a small duplex unit rent-free, in exchange for working as property manager of the duplex units. She acknowledged that this is considered a part-time job. In response to questioning about her duties, she testified that rent checks are delivered to her once a month and that it takes her ten to fifteen minutes to get the money processed and to the bank. The claimant mentioned that she had served 45 days in jail because she had outstanding fines on returned checks (of her own) and that the fines were dropped when she was released because of the time served. She first testified that she does not drive because she does not have

5

a car but, when specifically asked when she had last driven, she responded "the other day" when she borrowed her ex-husband's truck.  According to her testimony, she receives food stamps and does her grocery shopping "across the street" on a weekly basis.  The claimant maintains that, except for the days when the rent checks are delivered to her, she spends her time "doing nothing."  She denied watching television, attributing this to a lack of concentration.  She later mentioned that she naps during the day.

The claimant testified that she had been terminated from one job in 2007 because of "irrational behavior and outbursts."  She testified that she recently tried to work in sales and marketing at Ramada but was terminated because she was "butting heads" with the marketing manager.  She maintains that every time she tries to work she gets scatterbrained, confrontational, and argumentative.  The claimant is, however, apparently able to interact appropriately with the individuals who bring her their rent payments.  She testified that she is on bad terms with the owner of the duplex units but "deals with it."  She testified that she is on good social terms with her ex-husband.  She mentioned that she used to go to church and misses it but has no desire to go.

6

The claimant testified that on a "good" day she feels rested, goes through the day without confusion or confrontations, and is able to stay on task. However, she maintains that she has an average of only two good days a week and that, even on a "good" day, she loses concentration after 45 minutes to an hour.

The claimant initially alleged disability due to osteoarthritis, heart (SVT), "uteran," hernia, and bipolar. (Exhibit 2E). When filing her request for reconsideration, she alleged worsening of her bipolar disorder and "extreme" depression. (Exhibit 5E). She again claimed that her condition had worsened when she filed her request for hearing. The claimant alleged inappropriate behavior, disorientation, severe mood changes, severe depression, confusion, severe memory loss, and rapid, incoherent speech. (Exhibit 11E). At the hearing she testified that, in addition to her anxiety and depression, she has back and hip pain and sleep "issues." She maintains that she can lift eight or nine pounds with her right arm and ten to fifteen pounds with her left arm, that she can stand for two to three hours at most in an eight hour day, that she can walk fifteen to twenty minutes on a flat surface, and that she can sit for eight hours in an eight hour day. The claimant contends that she would not be able to show up at a full time job every day, would miss an average of two days a week because she would be too tired or have no concentration, and would not be able

to work the full day on the other three days.  With regard to her property management job, she testified that she could not work at this job full time because it would require too much interaction with the tenants.  The claimant acknowledges that she has had no formal psychiatric treatment.  She maintains that she wants psychiatric treatment but cannot afford it.  She is treated by a primary care physician, Dr. Abbasi, who charges $59.00 per visit.  These charges are reportedly paid by the claimant's ex-husband and her middle daughter.  According to her testimony, she has been taking Cymbalta since 2007 and Seroquel for the past year-and-one-half.  The Cymbalta reportedly does not help.  The Seroquel reportedly helps her mood but makes her tired.  She testified that she had taken lithium carbonate initially but is not currently taking it because it did not do anything.

The claimant has, on occasion, complained of pain in various joints.  For example, she complained of right hip pain in June 2006, at which time x-rays were normal.  (Exhibit 8F).  That was approximately 21 months before the alleged onset of her disability.  Primary care notes covering the period from June 2006 to October 2011 consistently describe her gait as being within normal limits.  (Exhibits 2F, 6F, and 9F).  Records of treatment do not show persistent musculoskeletal complaints that have been felt to warrant x-rays, any other imaging studies, or orthopedic referral.  The claimant,

by her own testimony, takes only over-the-counter medication for her allegedly disabling pain.

In terms of the claimant's alleged heart/SVT, records of treatment show that she complained of palpitations in June 2007, at which time she stated she had "bouts of SVT." Atenolol was prescribed at that time, apparently without further investigation of her complaints. (Exhibit 2F). The evidence of record does not document any episodes of SVT. Her palpitations were apparently well controlled on the Atenolol. SVT was not mentioned again until she was incarcerated. The claimant at that time stated that she had been diagnosed with SVT in March 2011, had been unable to have ablation secondary to insurance issues, and had been on Atenolol which had helped her manage this condition. (Exhibit 10F). The only medical evidence from March 2011 is a March 18 office note which makes no reference to palpitations, SVT, or ablation and does not list Atenolol among the prescribed medications. (Exhibit 6F).

In terms of the claimant's alleged "uteran," evidence establishes that she underwent a total abdominal hysterectomy in late April 2008 and reportedly tolerated the procedure well. Although she developed a subcutaneous hematoma postoperatively, this was reported to be resolving in early May 2008. (Exhibit 7F). The evidence of record does not reflect any subsequent gynecological complaints.

9

Records of treatment reflect that the claimant occasionally complained of back pain. For example, she complained of lower morning stiffness and lower back pain in June 2007, but no findings pertaining to her back were recorded on physical examination and her gait was described as being within normal limits. (Exhibit 2F). She again complained of lower back pain in August 2009, but no findings pertaining to the back were recorded on physical examination and the claimant's gait was described as being within normal limits. The primary diagnosis at that time was of obesity. The claimant's weight was recorded as 191.7 pounds and body mass index ("BMI") of 30.2. She once again complained of lower back pain, this time with some radiation to the buttocks, on January 25, 2010. Examination at that time revealed decreased range of motion of the lumbar spine with some tenderness; however, straight leg raising was negative. Notes do not indicate that any x-rays were ordered. The diagnosis was of lumbago, for which Soma, Motrin, and Lortab were prescribed. Notes from her next visit, in March 2010, reflect no complaint of back pain and show that only lithium, Xanax, and amoxicillin were prescribed. (Exhibit 6F). By October 2011 the claimant's weight had increased to 208 pounds and her BMI to 33.5. (Exhibit 9F).

10

In terms of the claimant's alleged bipolar, depression, and anxiety, she has been treated only by her primary care provider.  According to notes from August 2007 and February 2008, she was doing well, was kept on her current anxiety medications, and was instructed to call or return if her anxiety symptoms worsened or were no longer well controlled on those medications.  In May 2008, she reported that her anxiety and depression had worsened.  She denied any suicidal ideation, hallucinations, or delusions but complained that she was having difficulty sleeping and staying focused. The only mental status finding recorded at that time was "Normal affect and conversation."  Previously prescribed Xanax was discontinued at that time, and Klonopin was prescribed.  According to notes from July 2008, the Klonopin did not work for her.  The claimant stated that her level of anxiety seemed to be worsening and that she felt that the Cymbalta was not working as well as it had been.  Even though notes from May 2008 show that Xanax had been discontinued, the claimant stated that she was taking Xanax only once daily and was afraid to take it more consistently.  She stated that she was otherwise doing well.  Again, the only mental status finding recorded was "Normal affect and conversation."  Cymbalta and Xanax were prescribed at that time.  The claimant's affect and conversation have consistently been shown as normal on primary care visits, regardless of her subjective complaints, with the

11

exception of three visits: one in August 2009, at which time it was noted that she seemed very emotional and her speech very pressured; one in January 2010, and another in February 2010, when she was reportedly "talking too much." (Exhibits 2F, 6F, and 9F). These records do not show that the mental health referral was ever discussed with the claimant. The claimant testified that she could not afford formal psychiatric treatment.

Muhammad Abbasi, M.D., completed a form on February 3, 2012, expressing his opinion of the claimant's Ability to Sustain Work-Related Activities (Mental). (Exhibit 11F). Dr. Abbasi is a physician who has seen the claimant over a number of years, with a treating relationship that dates back to 2007. (Exhibits 2F and 6F). Dr. Abbasi is not a psychiatrist. Asked to describe any limitations and include the medical/clinical findings that support his February 2012 assessment, Dr. Abbasi only noted "severe mood disorder" and "anger issues." (Exhibit 11F at 4).

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## III.   Standard of Review

An individual is considered to be disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Id. at 1440.   "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that [s]he is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).   Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving her disability.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  At step one, the claimant must prove that she is not engaged in substantial gainful activity.  See id.  The claimant must establish at step two that she is suffering from a severe impairment or combination of impairments.  See id.  At step three, the Commissioner will determine if the claimant has shown that her impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.   If the claimant is able to make this showing, she will be considered disabled without consideration of age, education, and work experience.  See id. "If the claimant cannot prove the existence of a listed impairment, [s]he must prove at step four that [her] impairment prevents [her] from performing [her] past relevant work."  Doughty, 245 F.3d at 1278.  "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education,

14

and past work experience to determine whether the claimant can perform other work besides [her] past relevant work." Id.  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).

## IV.   Findings of the ALJ

The ALJ made the following findings of fact:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since March 1, 2008, the alleged onset date.  (20 C.F.R. §§ 404.1571, *et seq.*, and 416.971, *et seq.*).

3.   The claimant has the following severe impairments: low back pain, obesity, palpitations/supraventricular tachycardia, bipolar, major depressive disorder, and generalized anxiety disorder.  (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; is able to understand, remember and carry out very short, simple instructions but not detailed; maintain attention and concentration for two hour blocks of time; complete the workday and workweek without interruptions from psychologically based symptoms; perform at a

15

consistent pace without an unreasonable number and length of rest periods; occasionally interact with the general public, supervisors, and coworkers; respond to changes in the workplace; and set realistic goals or make plans independently of others.

6.    The claimant is unable to perform any past relevant work. (20 C.F.R. §§ 404.1565 and 416.965).

7.    The claimant was born on October 21, 1963, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 C.F.R. §§ 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English. (20 C.F.R. §§ 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2008, through the date of the ALJ's decision. (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

[R. at 22-31].

## V.    Discussion

At the first step of the sequential evaluation, the ALJ found that Plaintiff Corbett has not engaged in substantial gainful activity since March 1, 2008, her alleged date of disability onset.  [R. at 23].  At the second step, the ALJ found that Plaintiff has the following impairments: low back pain, obesity, palpitations/ supraventricular tachycardia, bipolar, major depressive disorder, and generalized anxiety disorder. [Id.].  Although Plaintiff's impairments are "severe" within the meaning of the Social Security Regulations, the ALJ found at step three that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. at 24].  At the fourth and fifth steps, the ALJ found that, although Plaintiff cannot perform her past relevant work, she can perform other jobs that exist in significant numbers in the national economy.  [R. at 30-31].  The ALJ therefore concluded that Plaintiff is not disabled.  [R. at 31].

Plaintiff argues that the ALJ's decision should be reversed.  [Doc. 12]. According to Plaintiff, the ALJ erred when he evaluated Plaintiff's mental impairments and gave only "little weight" to the opinion of her treating physician.  [Id. at 12-16]. Plaintiff also contends that the ALJ committed error when he interjected his

17

observations into the proceedings and used boilerplate language in discrediting Plaintiff's credibility.  [Id. at 16-19].

### A.    Plaintiff's Mental Impairments and Dr. Abbasi's Opinion

Plaintiff's primary care physician is Dr. Muhammad Abbasi, who is associated with Alliance Family Care.   [R. at 27, 47, 337-73, 393-97, 418-22].   At the administrative hearing in 2012, Plaintiff testified that she has been a patient of Dr. Abbasi for "15, 16 years."  [R. at 47].  Medical records show that Plaintiff has been seeing Dr. Abbasi since 2006.  [R. at 337-73].  In February 2012, Dr. Abbasi completed an assessment of Plaintiff's mental ability to sustain work-related activities, which is the only treating source opinion in this case.  [R. at 420-22].  Dr. Abbasi opined that in performing activities related to making occupational adjustments, Plaintiff could function satisfactorily only twenty percent of the time in an eight-hour workday in: following work rules; relating to co-workers; dealing with the public; interacting with supervisors; and maintaining attention and concentration.  [R. at 420]. Dr. Abbasi found that forty percent of the time, Plaintiff could: use judgment; deal with ordinary work stresses; and function independently.  [Id.].  The physician opined that in performing activities related to making performance adjustments, Plaintiff could function satisfactorily only twenty percent of the time in understanding, remembering,

and carrying out both simple and detailed job instructions.  [R. at 421].  Dr. Abbasi stated that in making personal-social adjustments, Plaintiff could never behave in an emotionally stable manner or relate predictably in social situations, that she could maintain personal appearance forty percent of the time, and that she could demonstrate reliability only ten percent of the time.  [R. at 421].

At the administrative hearing, the vocational expert testified that if Dr. Abbasi's limitations were accepted, there would be no work that Plaintiff could perform.  [R. at 74].  The ALJ wrote in his decision that he gave "little weight" to the opinion of Dr. Abbasi.  [R. at 29; Doc. 12 at 12-16].  Plaintiff argues that the ALJ's failure to credit Dr. Abbasi's opinion constituted error.  [Doc. 12 at 12-16].  In support of this argument, Plaintiff cites to Dr. Abbasi's long-term treating relationship with Plaintiff. [Id. at 12-14].  Plaintiff also points to the fact that the primary care physician prescribed a number of drugs such as Lamictal, Seroquil, Cymbalta, Klonopin, Zyprexa, Xanax, and lithium carbonate, which are used for bipolar disorder, major depressive disorder, panic disorder, anxiety disorder, and manic-depressive illness. [Id. at 14-16].  According to Plaintiff, Dr. Abbasi's February 2012 mental assessment is consistent with his notes and his prescription history, and she argues that the ALJ should have credited this opinion.  [Id. at 16].

19

Because the determination about whether a claimant has met the statutory definition of disability is reserved to the Commissioner, a medical source's opinion that a claimant is disabled is not controlling.  See 20 C.F.R. §§ 404.1527(d), 416.927(d).  However, the relevant regulations promulgated by the Social Security Administration state in pertinent part:

> (2)   Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . .
>
> > (i)   Generally, the longer a treating source has treated you . . . the more weight we will give to the source's medical opinion. . . .

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  A treating source's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  Id.  If the treating source's opinion is not given controlling weight, then the Commissioner is required to apply the following six factors in determining the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3)

supportability; (4) consistency; (5) specialization; and (6) any other relevant factors. See 20 C.F.R. §§ 404.1527(c), 416.927(c).

The Eleventh Circuit has consistently held that opinions of treating physicians must be accorded substantial or considerable weight by the Commissioner unless good cause exists to discredit these opinions. See Lewis, 125 F.3d at 1440; Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985). "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" Winschel v. Comm'r of Social Security, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting Phillips, 357 F.3d at 1241). An ALJ may disregard a treating physician's opinion with good cause, but his reasons for doing so must be clearly articulated in his decision. Id.

The court finds that in the present case, the ALJ had good cause to give little weight to Dr. Abbasi's opinion. See Forrester v. Comm'r of Social Security, 455 Fed. Appx. 899, 902 (11th Cir. 2012). The ALJ noted in his decision that, although Dr. Abbasi is a treating physician who has seen the claimant for many years, he is not a

21

psychiatrist. [R. at 29]. The ALJ also explained that he found "that the limited mental status findings recorded in [Dr. Abbasi's] office notes provide little support for the opinion he expressed regarding [Plaintiff's] ability to sustain work-related activities (mental)." [R. at 29]. The ALJ correctly noted that when Dr. Abbasi was asked to "[d]escribe any limitations and include the medical/clinical findings that support this assessment," he wrote only "severe mood disorder, anger issues." [R. at 29, 421]. No other supporting findings were listed by Dr. Abbasi.

Plaintiff cites to the numerous prescription medications issued by Dr. Abbasi to address her mental impairments. The ALJ discussed Plaintiff's medications in detail and pointed out that Dr. Abbasi's own treatment records, with few exceptions, describe the claimant's mental status as being normal. [R. at 29]. This was another reason offered by the ALJ for giving little weight to Dr. Abbasi's opinion. [Id.]. The ALJ cited to Dr. Abbasi's treatment notes which showed that Plaintiff's "affect and conversation have consistently been shown as normal on primary care visits, regardless of her subjective complaints, with the exception of three visits: one in August 2009, at which time it was noted that she seemed very emotional and her speech very pressured; one in January 2010, and another in February 2010, when she was reportedly 'talking too much.'" [R. at 29, 279-310, 337-73, 393-97]. The ALJ also

22

noted that records from Dr. Abbasi "do not show that the mental health referral was ever discussed with the claimant." [R. at 29]. As the ALJ explained, "If, indeed, the claimant's mental impairments were as severe, persistent, and limiting as indicated by Dr. Abbasi's medical source statement despite the medications he has prescribed over the years, it is reasonable to expect that he would have referred her for evaluation and treatment by a mental health professional." [Id.]. In addition, the ALJ pointed out that Dr. Abbasi opined that Plaintiff's "limitations had existed at the assessed severity since May 2007 (Exhibit 11F), which would be inconsistent with the alleged onset date of March 1, 2008." [R. at 29].

The ALJ properly evaluated Dr. Abbasi's opinion in light of the factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c). Plaintiff does not agree with the ALJ's decision to discount Dr. Abbasi's opinion because he is not a psychiatrist. [Doc. 12 at 13-14]. However, the relevant regulations not only permit but require ALJs to consider a physician's specialization, or the lack thereof as in the present case, when determining the weight to give to a medical source's opinion. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ cited to the conclusory nature of Dr. Abbasi's opinion and the fact that it was inconsistent with his own treatment records. See Winschel, 631 F.3d at 1179. In summary, the ALJ clearly articulated a number of

23

specific reasons for rejecting Dr. Abbasi's opinion, and he discussed the evidence supporting a contrary finding. Accordingly, the court finds that the ALJ had good cause not to credit the treating physician's opinion. See Winschel, 631 F.3d at 1179; Leiter v. Comm'r of Social Security Admin., 377 Fed. Appx. 944, 949 (11th Cir. 2010) ("Because the ALJ articulated specific reasons for declining to give the treating physician's opinion controlling weight, and these findings were supported by substantial evidence in the record, we hold that the ALJ had good cause to reject this opinion."); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) ("Where our limited review precludes re-weighing the evidence anew . . . , and as the ALJ articulated specific reasons for failing to give Dr. Pardo's opinion controlling weight, we find no reversible error.") (internal citation omitted).

## B.  ALJ's Credibility Determination

Plaintiff Corbett also argues that the ALJ erred in evaluating her credibility because he allegedly interjected his own observations into the proceedings and used boilerplate language. [Doc. 12 at 16-19]. When a claimant seeks to establish disability through subjective testimony of pain or other symptoms, a three part "pain standard" established by the Eleventh Circuit applies. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical

condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Id. If the ALJ decides to discredit a claimant's testimony, he must give explicit and adequate reasons for doing so. See id.; Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing MacGregor, 786 F.2d at 1054).

Here, the ALJ applied the proper legal standard in evaluating Plaintiff's subjective symptoms. [R. at 26]. The ALJ found that, although Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible. [R. at 27]. Plaintiff contends that the ALJ erred because he used boilerplate language in his evaluation of Plaintiff's credibility. This argument is unpersuasive. There is no dispute that the ALJ used some boilerplate. But this was not improper because he fully discussed the record and offered an extensive discussion of his reasons for concluding that Plaintiff's subjective symptoms were not entirely credible.

With regard to Plaintiff's alleged mental limitations, the ALJ noted that treatment records from August 2007 and February 2008 revealed that Plaintiff "was doing well, was kept on her current anxiety medications, and was instructed to call or return if her anxiety symptoms worsened or were no longer well controlled on those medications." [R. at 28, 307, 309]. The ALJ cited to records from May 2008 which showed that Plaintiff reported that her anxiety and depression has worsened. [R. at 28, 304]. Plaintiff "denied any suicidal ideation, hallucinations, or delusions but complained that she was having difficulty sleeping and staying focused. The only mental status finding recorded at that time was 'Normal affect and conversation.'" [Id.]. After Dr. Abbasi adjusted Plaintiff's medication, she was doing well by October 2008, and she was kept on the same anxiety medications. [R. at 298]. As discussed *supra*, the ALJ noted that Plaintiff's affect and conversation were consistently found to be normal with the exception of one visit in August 2009 and two visits in early 2010. [R. at 29, 279-310, 337-73, 393-97]. Substantial evidence supports the ALJ's decision not to fully credit Plaintiff's subjective testimony regarding her alleged mental limitations.

26

Plaintiff argues that the ALJ improperly interjected his own observations into the proceedings when he wrote, "While the claimant testified that she could not afford formal psychiatric treatment, her testimony lacks credibility and is not convincing as there are generally mental health providers who base their charges on an individual's income."[1]   [R. at 29].   The ALJ correctly noted that Plaintiff never sought mental health treatment from anyone other than her primary care physician and that treatment records from Dr. Abbasi "do not show that the mental health referral was ever discussed with the claimant."   [Id.].   It was proper for the ALJ to consider the lack of treatment from a mental health professional in evaluating Plaintiff's credibility.   The relevant regulations state that one of the factors that will be considered in evaluating a claimant's credibility is the treatment the claimant receives for relief of symptoms. See 20 C.F.R. § 404.1529(c)(3); 416.929(c)(3).   Even assuming *arguendo* that the ALJ was incorrect in his assertion that mental health providers are generally available to

---

[1]Plaintiff notes that she testified at the administrative hearing that she is able to drive even though she does not own a car.  [R. at 49].  However, the ALJ mistakenly wrote that Plaintiff "first testified that she does not drive because she does not have a car but when specifically asked when she had last driven, she responded 'the other day' when she borrowed her ex-husband's truck."  [R. at 25].  While there is no question that the ALJ did not accurately describe Plaintiff's testimony, this error was harmless. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (finding erroneous statements of fact made by the ALJ to be harmless errors).

27

low income individuals, remand is not warranted on this basis.  "Judicial review is not for the purpose of exacting punctilio but to assure that the [Commissioner's] determination does not trespass the statute."  <u>Ware v. Schweiker</u>, 651 F.2d 408, 413 (5th Cir. 1981).  The ALJ in the present case applied the proper legal standard when evaluating Plaintiff's credibility.  He offered a detailed discussion of the record and provided numerous specific reasons for not fully crediting Plaintiff's subjective complaints, and these reasons are supported by substantial evidence.

## VI.    Conclusion

For all the foregoing reasons and cited authority, the court finds that the ALJ's decision was supported by substantial evidence and based upon proper legal standards. It is, therefore, **ORDERED** that the Commissioner's decision be **AFFIRMED**.  The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner.

**SO ORDERED**, this 25th day of February, 2015.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE